## RUDOLPH et al. v. WILLIAMS et al.

### (Circuit Court, S. D. New York. December 6, 1893.)

PATENTS—WHO ENTITLED—PRIORITY OF INVENTION.

 In a suit to obtain a patent under Rev. St. § 4915, the evidence was substantially the same as that in interference proceedings in the patent office between the parties, in which priority of invention had been awarded to defendant; his testimony, substantially corroborated, being sufficient to discharge the burden of proof resting on him therein, while complainant's testimony to his prior conception of the invention was uncorroborated, and its credibility impaired by circumstances, and as to reduction of the invention to practice, on which the parties directly contradicted each other, complainant was supported only by indefinite and unreliable testimony of others. *Held*, that the bill must be dismissed on the weight of evidence.

This was a suit by Henry Rudolph and others against Benjamin A. Williams, George N. Williams, and others, to obtain an adjudication that complainants were entitled to a patent.

The bill in this action was filed under section 4915 of the Revised Statutes, which, so far as applicable to the present controversy, reads as follows:

"Whenever a patent on application is refused, either by the commissioner of patents or by the supreme court of the District of Columbia upon appeal from the commissioner, the applicant may have remedy by bill in equity; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear."

The question involved is purely one of fact. It is whether Henry Rudolph or George N. Williams, Jr., is the inventor of the "method of feeding the reciprocating saw blade of a stone-sawing machine, which consists in imparting to said saw blade, during its reciprocating movements, a forward or feeding movement during both its backward and forward strokes; said feeding movement corresponding in extent or rate to the speed at which the saw blade is moving, forward or back, at all times, substantially as set forth." The matter in controversy was the subject of interference proceedings between these parties. The examiner of interferences awarded priority of invention to Rudolph. His opinion was reversed by the examiners in chief, and their decision awarding priority to Williams was affirmed by the commissioner.

The opinion of the commissioner of patents on appeal from the decision of the examiners in chief in the interference proceedings was as follows:

Mitchell, Commissioner. The issue in controversy is as follows: "The herein described method of feeding the reciprocating saw blade of a stone-sawing machine, which consists in imparting to said saw blade, during its reciprocating movements, a forward or feeding movement during both its backward and forward strokes, said feeding movement corresponding in extent or rate to the speed at which the saw blade is moving forward or back, at all times, substantially as set forth."

v.62F.no.7—37

Prior to the making of the invention herein involved, diamond saws had been constructed so as to cut only during the forward movement of the saw, that is to say, the feeding mechanism of the saw blade operated only during the forward movement of the saw and was inoperative during its backward movement. The downward pressure of the saw blade was relieved during its backward movement by means of a "lift" mechanism. The method or process in issue was reduced to practice when the invention was perfected by disconnecting the "lift" mechanism, thereby permitting the saw to cut while traveling in each direction, and by adding a second ratchet and ratchet lever with appropriate mechanism for imparting a continuous or nearly continuous rotary movement in the place of the previous intermittent movement. There are therefore two elements present in the method of the issue, to wit, imparting a backward and forward movement to the saw with pressure upon the stone during both movements, and feeding the saw to the stone upon both strokes, the feeding movement corresponding in extent or rate to the speed at which the saw blade moves.

This preliminary discussion as to the construction of the issue seems to be necessary in order to determine what proof is required to show conception of the invention. Obviously it is not sufficient to prove conception of the idea of making a diamond saw cut both ways, for that would simply be the result of the method involved in the issue. It should be determined when the conception extended to the method of doing it substantially as it was finally done; that is to say, by taking off the lift and putting on a ratchet apparatus of such a kind as would give the continuous movement to the feed-operating shaft instead of an intermittent movement.

Williams' preliminary statement avers that he conceived the invention in July, 1886; that he disclosed it to Benjamin A. Williams in the same month; that he explained the invention to Rudolph—his rival in this interference— some time between the 1st of August and the 1st of September; that he instructed Rudolph to put such invention on a stone-sawing machine belonging to himself, giving him full instructions as to the invention, and how to apply it; that it operated successfully some time during the month of October; that about October 25, 1886, he made a pencil drawing and submitted it to his solicitor, from which to apply for letters patent.

In support of this statement Williams testifies that he conceived the invention in July, 1886; that about the middle of that month he explained to his cousin Benjamin A. Williams the nature of the mechanism or device which he intended to employ; that he reduced the invention to practice through Rudolph, his engineer; that he first directed Rudolph to remove the lifting apparatus from the saw, as he wished to see how the machine would work without the "lift;" that the saw ran without the lift for about a month; that at the end of the month he instructed Rudolph to have the ratchet attachment made and put upon the machine, which he did some three or four weeks afterwards; that the object in removing the lift was to ascertain by trial whether it was necessary to relieve the blade in order to permit the detritus to escape from the channel in the stone, it having always been considered impossible to run a diamond saw without a lift, on account of the supposed tendency to clog the blade, thereby causing breakage; that this trial proved to him that there was nothing to prevent feeding the saw during both the forward and backward stroke; that after the apparatus was changed to feed during both movements of the saw the lift was never replaced; that the saw has been used ever since continuously, and that his first idea that Rudolph claimed the invention was some time in November or December, 1886, from common report. Williams further testifies that the ratchet device did not feed exactly at first, and was removed without having actually been the means of sawing any stone; that it was soon refitted and replaced; that after it had been run successfully a part of the day it was removed, because he did not wish outside parties to know that he had succeeded in making a diamond saw cut in both directions, and that he cautioned his men to say nothing about it, as he thought of taking out a patent. Williams further testifies positively that he did not derive his first ideas of the invention from Rudolph, nor did he receive from any one any suggestions as to how the invention ought to be embodied in a working attachment to a stone saw.

Benjamin A. Williams, a cousin of the applicant, states that in July, 1886, Williams told him how to make a saw cut both ways by applying ratchets to make the saw feed in both directions; that he said "he was going to take off the lift and put on this other ratchet;" that his cousin ordered the changes referred to; that the device was taken off for fear some outside party would see it and apply for a patent; that it was put on again and the saw run, as soon as the solicitor advised them it was safe to do so, and that it was left on the machine at work and "it is there still."

George N. Williams, father of the applicant, also gives corroborating testimony.

Henry Muller also testifies on behalf of Williams. Muller was in charge of the saw to which the attachment was originally applied at the time when it was applied. He testifies that so far as he knew Mr. Williams ordered the attachment to be put upon the saw; that his reasons for thinking so are that he saw Mr. Williams explaining to Mr. Rudolph, but was not able to understand what he was saying, but that Rudolph told him "that Mr. Williams wanted to get the saw fixed so that it would cut both ways, and he said Mr. Williams wants to take a patent on that;" that this was about July, 1886; that when the attachment was taken off "Mr. Williams came up and told us to take it off;" that when it was put on "Mr. Williams told us to put it on again," and that nobody but Mr. Williams "gave any orders about putting on or taking off the attachment" in his presence; that Rudolph told him that Williams had shown him drawings for the attachment, and that Rudolph never told him that he showed Williams how to make and put on the attachment.

William Murphy, formerly in the employ of Williams, testifies that he made acquaintance with Rudolph on the evening when the latter took charge of Mr. Williams' boiler and engine; that from that time to the present he had seen him frequently; that he had several conversations with Rudolph concerning the feed attachment in his engine room, and that Rudolph always gave him "to understand that it was Mr. George N. Williams that first proposed the altering of the saws to cut both ways."

This body of testimony on behalf of Williams is in a broad way consistent, seems to be truthful, and is fitted to discharge the burden of proof which rests upon him, unless Rudolph shall establish an earlier date by testimony equally weighty and credible.

Rudolph testifies that he conceived the invention on October 26, 1879, while on a visit which he made with the witness Zetsche to a stone yard in Mott Haven; that while there he saw a diamond saw in operation and noticed that it was cutting only in one direction; that he saw it would be a simple matter to make it cut both ways; that he "made a little sketch and explained it to Zetsche which way that saw could be made to cut backward also forward from both ends;" that this sketch was not preserved; that to accomplish this result he intended to put "an extension in the 'rocker arm' which had been placed on the machine and put another lever to the feed shaft where I would have placed another ratchet;" that he would take the "lift" off the machine and run the saw without it; that where a double ratchet was put on the machine the lift would be of no use; that he fixes the date of his visit to the Mott Haven stone yard by his shipping on that date, October 26, 1879, his furniture to Peekskill, and introduces in evidence a duplicate receipt, dated October 26, 1879, from the captain of the steamer which had transported his furniture to Peekskill. He testifies that the sketches he showed Zetsche on this date were for a double ratchet motion for a diamond saw, and were rough sketches made at the time with lead pencil, and that Zetsche understood the invention. On cross-examination, however, he states that he does not think that Zetsche perfectly understood the invention at the time he says he described it to him in 1879.

Adolph Zetsche, who is a machinist, swears that he went into the Mott Haven stone yard with Rudolph on October 26, 1879; he fixes the date because it was his birthday; that when they were coming out of the yard Rudolph told him that "by putting on another arm and ratchet he could make the saw feed both ways; he described a little of it there, but not much, and I did not take much notice of it;" and in answer to the question, "On this

occasion you have just referred to, did Mr. Rudolph make any sketches to illustrate or explain his idea?" he says, "He made a little of it; but mostly I suppose I forgot."

This is the evidence upon which rests the so-called "conception of 1879." Even if Zetsche's testimony is to be credited it is not clear that he derived from Rudolph any conception of the method to be employed for securing the desiderated result. In a fair sense it may be said that Rudolph's conception in 1879 of the subject-matter in issue rests upon his uncorroborated testimony, which certainly is not a sufficient basis for a decision in his favor upon that question, unless such testimony is absolutely unimpeached and unaccompanied by circumstances tending to impair its credibility. Unfortunately for Mr. Rudolph it appears that October 26, 1879, fell on Sunday; that the stone yard was not open on Sundays, and that there was no diamond saw there at all at that time. In rebuttal Rudolph says that he was in error as to the day of his visit to the stone-yard, and that it should have been October 28, 1879; but this explanation involves a conflict between his testimony and Zetsche's, who distinctly says that the event took place on October 26, 1879, because it was his birthday. Zetsche was not called in rebuttal. It is impossible to find from this testimony that Rudolph conceived the invention in 1879.

Rudolph went into the employ of R. A. & G. N. Williams, Jr. (the latter partner being the other party to this interference), on May 17, 1886, to act as engineer and oversee the machinery in their stone yard. He says that on the day of his being employed he looked over the machinery and remembered when he first thought of the improvement in 1879. On cross-examination, however, he testifies that he had forgotten all about the invention until his recollection was revived on getting his situation at Williams' yard. He says also that he told Zetsche at that time that he would now go to work to try his invention, if Mr. Williams would give him permission, and also that he told his family; that he made more sketches of the invention at Zetsche's home on the evening of May 17, 1886, and told him (Zetsche) that he would let him do the work for him whenever he got the privilege to put the invention on the saw.

Zetsche states that Rudolph reminded him of his invention on the same day that he got the job, and said that he had got a good show to put it on if the boss would let him; that a sketch was made by Rudolph and shown him, and that he guesses this sketch was thrown away. Rudolph testifies to other sketches made in June or the beginning of July, 1886, in the presence of his wife and daughter, and that these sketches were not preserved.

Adele Rudolph testifies that her father said on the day that he took his position in Williams' stone yard, that the saw cut only one way and that he knew how he could make it cut in both directions, doing double the work in the same time, and that her father made some sketches at home in the evening, right after Decoration day.

The trouble with this testimony is that it is indefinite, and, it must be added, unreliable. No sketches are produced in evidence, nor is there any description by any witness clearly showing that Rudolph conceived, not only the result to be accomplished, but the method of its accomplishment. If Rudolph considered himself the inventor, and if the reduction to practice under the direction of Williams was a reduction to practice of ideas previously thought out by Rudolph, it is very strange indeed that the witness Muller, who had charge of the diamond saw that was altered, should have been told by Rudolph himself that Mr. Williams wanted to get that saw fixed so that it would cut both ways, and that Mr. Williams was to get a patent upon it, without asserting himself any claim whatever to the invention. It is true that Peterson testifies that about June 11, or 12, 1886, Rudolph explained to him that the saw at that time cut on only one stroke, and that he thought he could make it cut on both strokes, and that Rudolph said he was going to take out a patent on it. Peterson fixes the date by a letter from one James Callery which he says he received at that time. This letter referred to private business solely, and Peterson admits that Rudolph called frequently upon him before and after June, 1886, and that he received numerous other letters from this same James Callery. Cross-question 41 and

its answer are as follows: "Can you swear positively that in one of his later visits to you, in 1886, Mr. Rudolph did not call at the same time that you received a letter from Mr. Callery? A. I can't swear positively, but he may have been there on the same day when I received a letter from Mr. Callery, but I don't remember that he was."

It should be added that none of the witnesses for Rudolph speak of the removal of the lift as part of Rudolph's conception and sketches, and that feature, as has been seen, is an essential part of the method of the issue. Williams' conception, which is proven to have been in July, 1886, included the removal of the lift, as well as the alteration in the ratchet mechanism.

Rudolph's testimony as to the reduction to practice is diametrically opposite to that of Williams. He says that he was first to remove the lift, and communicated the invention to Williams. Williams testifies that he communicated the invention to Rudolph, and instructed Rudolph to remove the lift and do the mechanical work to make the alteration. It is difficult to conceive of a more direct conflict of testimony. As has been seen, however, Williams' testimony as to the reduction to practice is substantially corroborated, and I am compelled to accept it as in the main correct. This involves the rejection of the testimony of Rudolph as to a matter where he clearly could not have been mistaken. A familiar rule requires that little if any weight should be attached to the balance of his testimony where it is coincident with the dictates of self-interest.

There are several other items of evidence to which I do not deem it necessary to advert in detail. I have examined the decision of the examiners in chief with reference to them, and concur with the conclusions with respect to such testimony reached in that opinion. And I concur also in the general conclusion of the examiners in chief that Williams is the real inventor of the method disclosed in the issue, and that the testimony, so far as it tends to the opposite result, is not to be credited.

The decision of the examiners in chief is affirmed.

James O. Chapin, for complainants.
Walter S. Poor, for defendants.

COXE, District Judge. It is argued by the defendants that a court of equity should not, under the provisions of section 4915, award a patent to a party who has litigated the question of priority of invention through all stages of the patent office, and been defeated, simply because the court, if the question had been originally presented to it, would have reached a different conclusion. It is insisted that something more than the ordinary quantum of evidence is required of a complainant who seeks to secure a decree, upon a simple question of fact, at variance with the deliberately expressed judgment of the patent office officials, and, it is suggested, that the action must proceed upon the same lines as though it were a bill filed to set aside a judgment at law. There is certainly force in these propositions,[1] but it is unnecessary to discuss them for the reason that, upon the record now presented, the court is of the opinion that the weight of evidence sustains the contention of the defendants. There is too much of suspicion, improbability and contradiction surrounding the complainants' evidence to justify the court in giving it credence.

The evidence here is substantially what it was in the interference proceedings, and as the salient points have been clearly stated in the three opinions there rendered it is unnecessary to recapitu-

[1] Note. See Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772.

late them here. The reasons for the decision in Williams' favor. are found at length in the opinion of the commissioner. They cannot be stated with greater cogency. I agree with him.

The bill is dismissed.

